Gershengorn, Wendie I., J.
This legal malpractice action alleging negligence and breach of contract against Attorney Donna Lagaña Silva (Lagaña Silva) is being prosecuted by the plaintiffs, Paul Celin and Marie Aimed a Celin (the Celins), as assignees of Lagana Silva’s former clients, John Mazzeo, Joanne Mazzeo and Joseph Mazzeo (the Mazzeos), who were defendants in an underlying personal injury action brought by the Celins.[2] Lagaña Silva has filed counterclaims alleging abuse of process and violation of G.L.c. 231, §6F. Lagaña Silva now moves for summary judgment on the grounds that the Celins’ claims are barred by the doctrine of judicial estoppel. The Celins have filed a cross motion for summary judgment on their claims and on Lagaña Silva’s counterclaims.

BACKGROUND

The summary judgment record reveals the following undisputed facts. On October 29, 1994, the Celins were on the grounds of Somerville High School. While Paul Celin used a portable toilet there, a group of approximately ten white teenage boys approached the portable toilet. Some of the youths rocked it and pushed it over and some yelled racial epithets at the Celins, who are black individuals of Haitian origin.
On May 13, 1997, the Celins filed their original complaint against the youths and their parents, alleging violations of the Massachusetts Civil Rights Act (Count I), negligence (Count II), civil assault and battery (Count III), loss of consortium (Count IV), negligent infliction of emotional distress (Count V), and violation of the Massachusetts Equal Protection Act (MERA), G.L.c. 93, §102 (Count VI). In addition to the Mazzeos, the defendants in that action were Justin and Paul Savage (the Savages), Adam, Deborah, and W. Edgar Ackerley (the Ackerleys),[3] and Kosta, Nicolaos, and Irene Kritikos (the Kritikoses), as well as *256 John Does I-VIII and Parents Doe I-VTII. The Celins amended their complaint twice, once on November 19, 1997, to add as a defendant the grandparent of Adam Ackerley, and a second time, in July of 1998, to add a claim for intentional infliction of emotional distress.[4]
In the summer of 1997, the Mazzeos paid a retainer to the Law Office of Ralph Champa to represent them in the Celins’ action. Lagaña Silva was an associate attorney working for Ralph Champa (Champa) and became involved in some aspects of the defense of the Mazzeos and the Ackerleys against the Celins’ claims. On August 14, 1997, Lagaña Silva sent the Celins’ counsel, Attorney Paul Holtzman (Holtzman) a letter notifying him that she was enclosing the Mazzeos’ and the Ackerleys’ answers to the original complaint, signed by Champa, and Champa’s notice of appearance as counsel for the Mazzeos. Lagaña Silva also signed her name to the attached certificate of service. Neither Champa nor Lagana Silva ever filed with the Court a notice of appearance as counsel for the Mazzeos or the Mazzeos’ answer to the original complaint. Lagaña Silva testified that she learned from Holtzman in November of 1997 that these documents had not been filed.
On September 24, 1997, Lagaña Silva sent to Holtzman and counsel for other defendants a letter relating to delayed discovery “until our clients, the Ackerfys [sic] and the Mazzeos” attempt to resolve homeowners insurance issues. (Emphasis added.) Once it was clear that insurance was not available to them, the Mazzeos did not cooperate or communicate with Champa or Lagaña Silva as necessary for defense and discovery. In September and October of 1997, the Mazzeos failed to attend four scheduled appointments at Champa’s office and did not return calls from Champa urging their cooperation. On October 3, 1997, Lagaña Silva wrote the Mazzeos a letter at Champa’s direction notifying them of Champa’s intention to withdraw as their counsel once he received notification from them identifying successor counsel.
Correspondence from some counsel reflected their understanding that the Mazzeos were seeking new counsel. On November 3, 1997, counsel for the Kritikoses wrote a letter to Holtzman stating that she understood at that time that John Mazzeo was not represented. By letter dated November 17, 1997, Holtzman wrote to Lagaña Silva, referring to the Mazzeos as her clients and stating that he understood that new counsel had not entered an appearance for the Mazzeos.
Also on or shortly after November 19, 1997, Joanne Mazzeo met with Champa and Lagaña Silva for about ten minutes and picked up the Mazzeos’ file. Based upon their conversation and Ms. Mazzeo’s retrieval of her file, Lagaña Silva believed that Ms. Mazzeo understood at that point that she, her husband, and their son were no longer represented by Champa or Lagaña Silva. Within two weeks of that meeting, Lagaña Silva telephoned all counsel in the Celins’ personal injuiy action to notify them that Champa and Lagaña Silva were no longer representing the Mazzeos.
Nonetheless, on March 31, 1998, Champa wrote to Ms. Mazzeo and warned that she, her husband and their son would be defaulted if they did not answer the amended complaint. Champa also requested that she come into the office immediately to discuss options. In April of 1998, Champa prepared the Mazzeos’ answer to the amended complaint, but labelled it a pro se answer. When Ms. Mazzeo met with Champa and Lagaña Silva to sign the answer, she told Lagaña Silva that she would represent herself in that action. The Mazzeos’ pro se answer which was filed with the Court on April 15, 1998, was signed by Lagaña Silva but bore Champa’s Board of Bar Overseers number next to her name. Lagaña Silva concedes that for the limited purpose of drafting the Mazzeos’ answer to the amended complaint, either she and/or Champa were counsel to the Mazzeos.
On April 27, 1998, Lagaña Silva sent counsel for all parties correspondence stating that she was enclosing the Mazzeos’ pro se amended answer as well as her “motion to withdraw as counsel [for the Mazzeos and Ackerleys] which thankfully, all parties have assented to.” Lagaña Silva reported to other counsel that “while the Mazzeos do not intend to retain successor counsel in this matter, Attorney Neil Cola . . . has been retained for bankruptcy purposes.” Lagaña Silva signed the undated Assented to Motion to Withdraw.[5] Contraiy to the label of the motion, the Celins had not assented to it. Lagaña Silva never filed this motion with the Court.
At least by July of 1998, counsel for the Savages, the Kritikoses and Adam Ackerley’s grandmother, Theresa Ackerley, began to send correspondence to the Mazzeos directly at their home address as well as to Lagaña Silva.[6] Holtzman continued to send correspondence for the Mazzeos to Lagaña Silva.
During the discovery phase, Ryan Callahan testified at his deposition that he saw Adam Ackerley pushing the portable toilet and that he saw John Mazzeo touching the portable toilet when it was rocking. (During the 1995 criminal trial against the youths, Ryan Callahan had testified that John Mazzeo had been pushing the portable toilet.) Kosta Kritikos had testified at his deposition that he saw Adam Ackerley knock down the portable toilet.
The Mazzeos never responded to discovery requests. In August and October of 1998, the Celins filed an application and reapplication for entry of default judgment against the Mazzeos and the Ackerleys. They did not send copies of these applications to the Mazzeos, but to Lagaña Silva, who accepted service for these papers but did not forward them to the Mazzeos or confirm that they had notice of them.
In August of 1999, Champa passed away. Lagaña Silva began to practice law elsewhere.
In December of 1999, the Celins resolved their claims against the Ackerley defendants just before trial.[7] At the trial, the Mazzeos did not appear or present a defense. The Celins did not pursue the civil rights claims against the Savages and Kritikoses. On December 22, 1999, after trial, the jury found the *257 minor defendants Justin Savage and Kosta Kritikos liable to Mr. Celin on the negligence claims only.
In January of 2000, Holtzman sent Lagaña Silva a notice of an assessment of damages hearing (which was eventually continued to October of 2001) with respect to the defaulted Mazzeos. Lagaña Silva did not forward the notice to the Mazzeos or confirm that they had notice of it. The Court notice required the Celins to notify all the parties of the hearing.
In 2001, the Court (Neel, J.) adjudged the minor defendánts Savage and Kritikos to be jointly and severally liable to Mr. Celin in the amount of $20,200 plus interest and costs, and dismissed all other claims and cross claims between the plaintiffs and the Savages and the Kritikoses.
On March 12, 2001, the Celins moved to amend an earlier judgment in order to reflect a separate judgment against the defaulted defendants, the Mazzeos. The certificate of service for that motion states that Holtzman arranged to serve a copy of the motion upon Lagaña Silva as counsel for the Mazzeos. Holtzman did not send a copy of the motion to the Mazzeos at their address.
On October 15, 2001, the plaintiffs’ counsel argued at the assessment of damages hearing that
As to the distinct trauma suffered by [the Celins] resulting from the racial threats, the intimidation, the fear of bodily harm, and in fact, death that they testified — or he testified in particular he suffered as a result of hearing the racial threats and the gang approaching himself, [he] has not been compensated, and again, appropriately compensated by award against the Mazzeo defendants. Likewise, the actual toppling of the . . . structure would be properly compensated against. . . Mr. Mazzeo .. . Again, the testimony would, support a finding that it was Mr. Mazzeo himself who toppled the toilet Likewise, the testimony would support a finding that it was Mr. Mazzeo who rolled the toilet subsequently in order to prevent Mr. Celin from escaping from the structure. Finally, the period following Mr. Celin’s exit from the structure when he was covered by human waste and was taunted by certain individuals, there was no testimony supporting any conclusion that the two trial defendants [Savage and Kritikos] had anything to do with that period either, and again, there was further humiliation, distress and anxiety suffered by [the Celins] during that final period. Your Honor, all that relates to compensatory damages, [an] appropriate award of compensatory damages against John Mazzeo.
(Emphasis added.) Essentially, the plaintiffs’ position at that hearing was that John Mazzeo was legally responsible for civil rights violations because (1) the trial evidence supported that finding and (2) because there was no evidence in the trial that Kosta Kritikos or Justin Savage engaged in intentional conduct, the Mazzeo defendants were presumed to be liable by reason of their default. At the damages assessment hearing, in response to the Court’s question as to whether counsel had heard from the Mazzeos, Holtzman replied only that “It’s been some time, your Honor. They had been represented by counsel.”
On October 19, 2001, the Celins asserted in their Supplemental Memorandum in Support of Motion to Alter or Amend March 1, 2001 Amended Judgment that
The civil rights statutes require such an award in order to punish the conduct of John Mazzeo and to deter future racially motivated assaults by Mr. Mazzeo and others. [T]he damage award against John Mazzeo pursuant to the default judgment must reflect his established liability for a willful, vicious, racially motivated assault. . .
On February 11, 2002, a default judgment entered against the Mazzeos in the amount of approximately $255,000. The Court assessed damages against the Mazzeos for categories of damages which were not duplicative of the earlier award to the Celins by virtue of the verdicts against the Savages and Kritikoses.
On July 8, 2002, Holtzman sent directly to Joseph Mazzeo at his home address a deposition notice and a copy of the default judgment. Holtzman wrote, “Please advise whether Attorney Silva remains your counsel or whether you have another attorney with whom you would prefer that I communicate.” He also proposed negotiating a resolution of the outstanding judgment against John Mazzeo.
On July 10, 2002, Lagaña Silva sent Holtzman a letter requesting him not to include her in his mailings or notices regarding the suit against the Mazzeos. In the letter, Lagaña Silva stated that Champa’s respresentation of the Mazzeos ended years earlier.
On December 6, 2002, the Mazzeos filed this action alleging that Lagaña Silva[8] was negligent and in breach of contract by failing to engage in discovery, to attend scheduled court proceedings or trial, for failing to present unspecified viable defenses at trial, for failing to remove the default judgment against the Mazzeos or otherwise to protect their interests with respect to the assessment of damages.
On February 3, 2003, the Mazzeos moved to remove the default judgment. The Court (Neel, J.) denied it, reasoning
[Defendants] have made no showing that they have meritorious defenses to any of the claims against them; this, coupled with the unexplained delay in seeking relief, and the years-long neglect of this claim by [defendants], does not satisfy the Court, under the test... that relief should be granted under Rule 60(b). It is particularly notable that the principal defendant, John Mazzeo, submitted no affidavit.
In March of 2003, the Mazzeos, represented by Attorney Donald Conn, assigned to the Celins any and all claims for damages and money owed based upon any legal malpractice claim which they might have *258 against Lagaña Silva or Champa’s estate.[9] The same month, the plaintiffs filed an amended complaint adding as party plaintiffs the Celins as assignees of the Mazzeos. The Mazzeos have not participated in discovery in this action.[10]

DISCUSSION

This Court grants summary judgment where there is no genuine issue of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party has the burden of affirmatively demonstrating that a genuine issue of material fact does not exist. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989)

1. Judicial Estoppel

Judicial estoppel is an equitable doctrine that precludes a party from asserting a position in one legal proceeding that is contrary to a position it had previously asserted in another proceeding. Blanchette v. School Comm. of Westwood, 427 Mass. 176, 184 (1998). This doctrine is designed to bar litigants from manipulating the judicial process. Canavan’s Case, 432 Mass. 304, 308 (2000). “In deciding whether a party should be judicially estopped, we will look to see whether that party is seeking to use the judicial process in an inconsistent way that courts should not tolerate.” East Cambridge Savings Bank v. Wheeler, 422 Mass. 621, 623 (1996). See also Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (judicial estoppel may be appropriate when a litigant is “playing fast and loose with the courts”). Although the circumstances under which judicial estoppel may be appropriately invoked are not reducible to any general formulation or principle, the two fundamental elements comprising the core of a judicial estoppel claim are that: (1) a litigant has asserted a position which is directly inconsistent and mutually exclusive of the litigant’s position in a prior proceeding, and (2) the litigant succeeded in the prior proceeding in convincing the court to accept its position. Otis v. Arbella Mutual Insurance Co., 443 Mass. 634, 640-41 (2005). See Fay v. Federal National Mortgage Association, 419 Mass. 782, 788 (1995) (judicial estoppel normally applies where a party has successfully asserted his or her inconsistent position in a previous proceeding). Application of this doctrine is a matter of judicial discretion. Id. at 640.
Lagaña Silva contends that the Celins are judicially estopped from claiming in this action that it was Lagaña Silva’s negligence rather than the merits of the Celins’ claims against the Mazzeos which resulted in the judgment in the underlying action against the Mazzeos and in favor of the Celins. For this proposition, Lagaña Silva relies upon Otis v. Arbella Mutual Insurance Co., supra.
In Otis, the plaintiff first prevailed in his personal injury action as a pedestrian struck by an intoxicated driver. The plaintiff had successfully argued that he was not comparatively negligent because he was standing in the southbound lane of the road while the defendant traveled in the northbound lane, then swerved over into the southbound lane and struck the plaintiff. After realizing that the defendant’s assets were insufficient to satisfy the judgment, the plaintiff released the defendant from liability in exchange for an assignment of any claims the defendant might have against his defense counsel. As assignee, the plaintiff brought a legal malpractice action, alleging that counsel for the defendant in the underlying action had been negligent for failing to introduce evidence that the plaintiff had actually been in the northbound lane when struck and thus was more negligent than the intoxicated driver. Because the plaintiff was asserting a position completely inconsistent with his previous and successful position in the underlying action, judicial estoppel barred his subsequent claim against counsel, regardless of whether he took the second position as an assignee. See id., at 644 (“[t]hat it is an assignment that now makes it beneficial for him to change position does not ameliorate the harm to the judicial system posed by such conduct”).
While Otis is distinguishable because the plaintiff there prevailed in the first action after a trial rather than by way of a default judgment, it nonetheless supports application of judicial estoppel here. In the underlying case, the Celins alleged in their second amended complaint that they were entitled to an award of damages against the Mazzeos on the claims involving intentional conduct on the grounds that John Mazzeo pushed the portable toilet while knowing that Mr. Celin occupied it, yelled racist remarks at both plaintiffs, and that John Mazzeo’s parents were liable for the conduct of their minor son. At the hearing on assessment of damages, the Celins argued that the testimony at the trial of the Savages and Kritikoses would support a finding that John Mazzeo toppled the toilet and rolled it over to prevent Mr. Celin from escaping. It is only now at the summary judgment stage of this second action, while standing in the shoes of their former adversaries, the Mazzeos, that the Celins have taken a complete about face and argue that it was Lagaña Silva’s failure to represent the Mazzeos which caused the entry of default judgment and the assessment of damages against the Mazzeos because there was no evidence that John Mazzeo was aware that the portable toilet was occupied or that he was engaging in any intentional conduct upon which to base liability for a civil rights claim[11] It is plain that the Celins, after securing a favorable decision based upon their allegations regarding John Mazzeo’s conduct, now seek a legal advantage — to recover from Lagaña Silva because they could not recover from the Mazzeos — by adopting a wholly contrary position here — that there is no evidence that John Mazzeo engaged in the intentional conduct in question. Because the Celins have completely contradicted their earlier successful position with respect to the key issues of John Mazzeo’s conduct and liabiliiy, the *259 doctrine of judicial estoppel bars this action. See Otis v. Arbella Mutual Insurance Co., 443 Mass. at 644.[12]
There is no merit to the Celins’ contention that the means through which they prevailed in the underlying action, a default judgment, precludes judicial estoppel. Where, as here, the Court has entered a default judgment and assessed damages against the defaulted defendants, the plaintiffs prevailed. That the plaintiffs’ allegations were presumed to be proven true by virtue of the default, see Marshall v. Stratus Pharmaceuticals, Inc., 51 Mass.App.Ct. 667, 670-71 (2001), does not diminish their success in the earlier proceeding. See Otis v. Arbella Mutual Insurance Co., 443 Mass. at 641 (“judicial estoppel will normally be appropriate whenever a parly has adopted one position, secured a favorable decision, and then taken a contradictoiy position in search of legal advantage”) (quotations omitted). Contrast Fay v. Federal National Mortgage Association, 419 Mass. at 788 (settlement did not constitute success for purposes of judicial estoppel). The Celins have not cited any controlling or even persuasive authority for their theoiy that because the Mazzeos defaulted, judicial estoppel does not apply. [13]
In consideration of all these circumstances and in particular the Celins’ completely contradictoiy positions, judicial estoppel bars the Celins’ claims against Lagaña Silva. See Otis v. Arbella Mutual Insurance Co., 443 Mass. at 640-41.[14] Accordingly, Lagaña Silva’s summary judgment motion is allowed and the Celins’ summary judgment motion is denied.

2. Counterclaims for Abuse of Process and Violation of G.L.c. 231, §6F

Lagaña Silva has raised counterclaims for abuse of process and a violation of G.L.c. 231, §6F. Celin has moved for summary judgment on Lagaña Silva’s counterclaims. The court allows for summary judgment on the counterclaims.
In her abuse of process counterclaim, Lagaña Silva alleges that the Celins “are aware that no attorney-client relationship or other contract existed between the Mazzeos and Donna Lagaña Silva” and that they nevertheless maliciously brought this malpractice action in an effort to collect amounts owed to them by the Mazzeos. Lagaña Silva’s counterclaim for a violation of G.L.c. 231, §6F, is based upon the assertion that the Celins knew that Lagaña Silva owed no duty to the Mazzeos. The Celins seek summary judgment on these counterclaims.
Abuse of process is the use of a lawful process primarily for a purpose for which it is not designed. Gutierrez v. Massachusetts Bay Transportation Authority, 437 Mass. 396, 407 (2002). This claim is comprised of three elements: (1) the use of a process, (2) for an ulterior illegitimate purpose, (3) which results in damage to the party alleging abuse of process. Id.; Ladd v. Polidoro, 424 Mass. 196, 198 (1997). Furthermore, “(i]t must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.” Gabriel v. Borowy, 324 Mass. 231, 236 (1949).
In an abuse of process case, the subsequent misuse of process constitutes the misconduct for which liability is imposed. Quaranto v. Silverman, 345 Mass. 423, 426 (1963). Where the process is used for the exact purpose for which it was designed: litigating the rights of the parties, there is no abuse of process. Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389 (1975); Noyes v. Shanahan, 325 Mass. 601, 605 (1950).
Here, the plaintiffs use of process, bringing legal malpractice and breach of contract actions against Lagaña Silva, was used for the relevant purpose for which it was designed. The summary judgment record establishes that in 1997 and again in April of 1998, Lagaña Silva acted or at least held herself out to be counsel to the Mazzeos, even though she did not file an appearance with the Court. The Celins’ subsequent claims, raising issues of her negligence and breach of contract, were not of an “ulterior or illegitimate purpose.” Accordingly, the plaintiffs have committed no wrong in connection with the use of this process.
In addition to the abuse of process claims, the court allows the plaintiff s motion for summary judgment on defendant’s G.L.c. 231, §6F counterclaim. The court, however, denies plaintiffs motion for fees and costs.[15]

ORDER

For all the foregoing reasons, it is hereby ORDERED that Lagaña Silva’s motion for summary judgment is ALLOWED and the Celins’ cross-motion for summary judgment is DENIED. It is further ORDERED that the Celins’ motion for summary judgment on Silva’s abuse of process and G.L.c. 231, §6F counterclaims is ALLOWED. Tire Celins’ motion for costs and fees is DENIED.

 Celin v. Savage, Middlesex Civil Action Number 1997-02476.

 The Court spells this surname as indicated by Adam Ackerley in his deposition, not as others spell it.

 The second amended complaint largely tracks the counts of the previous complaints but added a claim of intentional infliction of emotional distress (Count VI) and renumbered the MERA claim as Count VII.

 Despite her attempt to withdraw as counsel for the Ackerleys, Lagaña Silva represented Adam Ackerley at his deposition on March 3, 1999.

 In July and December of 1998, counsel for the Savages sent to the Mazzeos at their home' address copies of tire Savages’ discovery responses. In December of 1998, counsel for the Kritikoses sent a copy of their answer to the second amended complaint to the Mazzeos at their home address. In May of 1999, counsel for Theresa Ackerley also sent to the Mazzeos directly at their home a letter regarding the dismissal of claims against Theresa Ackerley.

 OnDecember 14, 1999, the parties stipulated that the minor defendant Adam Ackerley was liable on the claims of negligence, negligent infliction of emotional distress, and loss of consortium (Counts II, IV and V of the second amended complaint) and *260 released him and his parents from liability on all remaining claims in exchange for the symbolic payment of $1 due to the Ackerleys’ lack of resources and the minor defendant’s acknowledgement from the outset of his involvement in the incident.

 The complaint also named as a defendant the estate of Champa, but have since dismissed their claims against the estate.

 In consideration of the assignments, the Celins agreed to cancel a deposition, forebear from ex parte seizures of further assets, and forebear from seeking an attachment on the Mazzeos’ home during the pendency of settlement discussions between the parties. The plaintiffs agreed that any amounts collected from the malpractice suit would offset the outstanding judgments against the Mazzeos.

 Similarly, the Mazzeos filed a petition for bankruptcy in March of 2004, but subsequently their bankruptcy counsel moved to withdraw due to non-communication by the Mazzeos. The Bankruptcy Court allowed the motion to withdraw and later dismissed the Mazzeos’ bankruptcy petition after they failed to appear at hearings.

 Moreover, since the Celins are standing in the shoes of the Mazzeos, it is ironic that their current position is at odds with what little we know about the Mazzeos’ position in the underlying action. Judge Neel noted in his denial of the Mazzeos’ motion to remove the default judgment in February of2003 that the Mazzeos had made no showing of meritorious defenses and had not explained their delay in seeking relief. The Mazzeos could have, but apparently did not, blame Lagaña Silva or Champa for the default judgment or offer an affidavit from John Mazzeo or any evidence to suggest a meritorious defense.

 Unavailing is the Celins’ argument that their previous and current positions are not contradictory simply because it is only in this second action that they claim that the cause of the Mazzeo’s default judgment was Lagaña Silva’s negligence. “In a malpractice action claiming that counsel for the defendant in a civil case was negligent, the defendant attorney can prevail by proving by a preponderance of the evidence that, even though he may have been negligent, the plaintiff, his former client, would have lost the case anyway.” Glenn v. Aiken, 409 Mass. 699, 706 (1991). Despite Lagaña Silva’s ultimate burden of proof on the causation element, the Celins cannot in this action take the same position as they had in the first suit regarding John Mazzeo’s conduct and liability without conceding the causation element. Therefore, although this action focuses upon Lagaña Silva’s conduct, her liability for legal malpractice cannot be viewed apart from John Mazzeo’s conduct and liability, which is precisely where the Celins have shifted their position completely between the first and second judicial proceedings.

 The Celins misplace reliance upon Franco v. Selective Insurance Co., 184 F.3d 4 (1st Cir. 1999). In Franco, the plaintiff first brought a personal injury action against a company which he then claimed was his employer at the time of his job-related injury. That defendant defaulted. After entry of default, but before the Court could enter a judgment of default, the parties entered into a settlement agreement and stipulated judgment which awarded the plaintiff $500,000 and assigned to him any rights or claims of the defendant against the defendant’s insurer which had denied coverage on the grounds that a policy provision excluded from coverage claims for bodily injury to employees. Thus, as assignee of the defendant to the first action, the plaintiff next sued the insurer. Contrary to his allegations in the first action in which he claimed to be an employee of the insured, the plaintiff in the second action alleged that he was not an employee and thus that the insurance policy exclusion did not apply. The Circuit Court held that the doctrine of judicial estoppel did not apply because the insurer could not meet its burden under First Circuit case law of showing that the plaintiff had used inconsistent positions to obtain an unfair advantage, because it was not clear that the plaintiffs recovery in the first action depended conceptually on proof that he was an employee, as he alleged in his complaint various theories of recovery which did not depend upon his being an employee.
Franco is inapposite to the case before me in several ways and therefore does not undermine application of the doctrine of judicial estoppel here. First, in Franco, the plaintiff shifted positions with respect to an issue which was not indispensable to his recovery against the defendant, as he had advanced in his complaint other theories not dependent upon his claimed status as an employee. In contrast the Celins have changed their fundamental position with respect to whether or not John Mazzeo was liable for engaging in the intentional conduct of pushing and toppling the portable toilet. Second, the settlement and stipulated judgment entered against the defendant in Franco distinguishes that case from this, as our courts have determined that settlements do not constitute success for purposes of judicial estoppel. See Fay v. Federal National Mortgage Association, 419 Mass. 782, 788 (1995). The Celins have not cited any Massachusetts appellate case holding that a default judgment does not amount to success for the plaintiff.

 The conduct of others involved in bringing about the Mazzeo’s default cannot be ignored and further supports this result to ensure that the judicial process is not being used in an inconsistent way which the courts should not tolerate. See East Cambridge Savings Bank v. Wheeler, 422 Mass. at 623. Even Lagaña Silva’s astounding series of missteps as chronicled in her deposition testimony does not erase others’ questionable behavior.
The summary judgment record demonstrates that Joanne Mazzeo understood that she and her family were representing themselves by late November of 1997, that they received communications about the litigation from counsel for other parties, and yet they made no effort to respond to discovery requests or otherwise defend themselves. In these circumstances, it would be unfair to reward the Celins, standing in the Mazzeos’ shoes, for the Mazzeos’ neglect simply because the underlying judgment was by default.
The Celins, through their counsel, may be playing it “fast and loose” with the Court in one other respect. Holtzman was far less than forthcoming, if not deceptive, when asked by Judge Neel at the assessment of damages hearing if he had heard from the Mazzeos. Holtzman did not explain that Champa had passed awayin 1999, that Lagaña Silva had never filed a notice of appearance, that she told Holtzman and other counsel in 1997 and 1998 that the Mazzeos were no longer represented by counsel in this matter, and that the Mazzeos’ answer to the amended complaint was filed pro se. Nor did Holtzman inform the Court, in light of the information he had, that he had not sent notices of the default applications or damages hearing to the Mazzeos directly, even though counsel for various defendants had sent their communications directly to the Mazzeos. Perhaps even more telling about Attorney Holtzman’s motives is that within five months after the default judgment entered against the Mazzeos in February of 2002, Holtzman sent directly to Joseph Mazzeo at his home address a deposition notice and a copy of the default judgment. Holtzman wrote, “Please advise whether Attorney Silva remains your counsel or whether you have another attorney with whom you would prefer that I communicate.” He also proposed negotiating a resolution of the outstanding judgment against John Mazzeo. He offers no explanation for why he began communicating directly with the Mazzeos and asking them to identify their counsel only after the default judgment entered. One could surmise that Holtzman, unlike counsel for several defendants, was not interested in notifying the Mazzeos about the default proceedings until they were complete.

 Ihe court treats the plaintiffs summary judgment request for attorneys fees and costs pursuant to G.L.c. 231, §6F as a motion for fees and costs associated with defending against the defendant’s counterclaims.